THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* LEE BATES (Impleaded), Defendant-Appellant.

(No. 55845;

First District—January 11, 1973.

*Rehearing denied February 1, 1973.*

Charles W. Nixon, of Chicago, for appellant.

Edward V. Hanrahan, State's Attorney, of Chicago, (Elmer C. Kissane and Peter F. Costa, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE McGLOON delivered the opinion of the court:

The defendant, along with three codefendants, was indicted by the Grand Jury for the offenses of murder and attempted armed robbery. After a jury trial he was found guilty of both offenses and sentenced to the Illinois State Penitentiary for a term of 30 to 40 years. In this appeal the defendant seeks to reverse those convictions on the grounds that: (1) he was charged under an invalid indictment, (2) his arrest was without probable cause thus tainting his later statements and identification by eyewitnesses, (3) identification testimony introduced at trial should have been suppressed because he was not informed of his right to counsel at a pre-indictment lineup, (4) the lineup at which he was identified was conducted so as to violate his constitutional rights, and (5) the pretrial hearing concerning the suppression of eyewitness identification was so restricted by the trial judge that a new hearing and trial should be granted.

We affirm.

On December 12, 1969, between 9:30 A.M. and 9:45 A.M. four men attempted to rob the Gateway National Bank on South Stony Island Avenue in Chicago. During the attempted robbery a bank guard, Richard Mix, was critically wounded by one of the offenders and died in Jackson Park Hospital four days later. The defendant and three other men were

subsequently arrested and indicted for the attempted robbery and murder. The case against defendant Bates was severed from the other co-defendants, and after a separate trial he was convicted of both offenses and sentenced as aforementioned.

The pertinent facts of the case were adduced during the course of two pretrial hearings and the jury trial that resulted in the defendant's conviction.

Gloria Clifford testified at trial that she was employed at the bank on the day of the attempted robbery. She stated that she saw a man later identified as Eddie Franklin, one of the co-defendants, scuffle with and shoot Richard Mix. She further stated she identified Franklin at a lineup held on December 29, 1969.

Jacqueline Siller testified at trial that she was an employee of the bank on the day in question. On the morning of December 12, 1969, she was distracted from her work by loud talking and the sound of a gunshot. She ran from her chair to look in the direction of the noise when a man, whom she later identified to be the defendant Bates, ran past her toward the front of the bank. She was knocked to the floor when another person fell across her legs. She saw the defendant with a gun in hand standing about 35 feet from her, facing her. She had an unobstructed view of the defendant for ten to fifteen seconds, and she heard him say two short sentences. She also saw him again through the window of the bank as he was fleeing north on Stony Island Avenue. After the police had arrived she described the man she saw as being short, Negro, coloring a little darker than her own, and wearing a tan or brownish colored three-quarter length coat.

Thomas Campbell testified at trial that on the morning of the attempted robbery he was in the bank to transact business. When he heard someone announce a "stickup" he turned and faced a man holding a gun. He heard the man speak twice and a few seconds later saw him put his gun in his belt and leave by the front door. At trial, in response to the State's Attorney's questions, Mr. Campbell stated that he could not absolutely identify the defendant but stated that if the defendant had a slight beard he would be the same man he saw the morning of the occurrence. He further testified that he described the offender to the police as being five feet six to seven inches tall, medium build, 145 pounds and having dark complexion, and wearing a Russian-style Mouton Lamb cap and a three-quarter length coat with a brown collar.

William Gaines testified that he was in the Gateway Bank on the morning of December 12, 1969. He described the man he saw shoot Richard Mix and stated he now knew his name to be Franklin. He further testified that he also saw two men at the door of the bank, the

shorter of the two held a gun. He later saw the same man through the bank window fleeing the scene. Mr. Gaines could not be certain that the defendant was the man he saw in the bank but stated he did resemble him. He described the man to the police as being young with light brown skin wearing a three-quarter length coat and a Russian-type hat with fur.

The testimony of Doris Fair and Marcia Kazwara, two employees of the bank on December 12, was substantially the same in that they both stated that they saw a man they now know to be Eddie Franklin shoot Richard Mix. They were both forced at gunpoint by a third man, who was neither Franklin nor the defendant, to go to the vault area of the bank. There they were given pillow cases and told to fill them with money. Mrs. Kazwara testified that when she told the offender that the vault could not be opened because they did not have the combination, the man swore, turned around and walked out of the building.

James Digby testified that he was also an employee of the bank on December 12, 1969. He witnessed the attempted robbery, heard the gunshot and saw Richard Mix fall to the floor. He stated that he saw one of the offenders take a bag to the commercial teller and order him to fill it. The offender then stopped by the door for a minute or two and then left. Mr. Digby further stated that the defendant looked like the man he saw by the door.

On April 6, 1970, a pretrial hearing was held on the defendant's motion to suppress his arrest and confession during which the following pertinent facts were disclosed through the testimony of the witnesses. Detective James Craig of the Chicago Police Department testified that on December 15, 1969, he became involved in the investigation of the attempted robbery and homicide that had occurred at the Gateway Bank. Detective Craig testified that he received information on December 21, 1969, from an undisclosed informant that the defendant was one of the participants in the attempted robbery. The informant told him that the defendant was then residing with a man named Buddy Gray and that the informant had seen guns at the apartment the two men shared. At that time Gray told the informant that the guns had been used in the shooting at the Gateway Bank. Gray also told the informant that the defendant Bates had participated in the attempted robbery. Craig further testified that he had received information from the informant in the past on about eight occasions resulting in three felony convictions and other misdemeanor convictions. Craig further testified that on the basis of this information he participated, along with other officers, in the warrantless arrest of defendant and Gray on December 22 at about

4:15 A.M. The arrest occurred as the suspects stood in an area marked as a cab stand on 43rd Street between Calumet and Prairie Avenues in the City of Chicago. Craig transported the defendant to Area 1 Police Headquarters and there at approximately 5:00 A.M. advised the defendant of his right to remain silent, that anything he said would be used as evidence against him, that he had a right to have a lawyer present, and that if he could not afford a lawyer, one would be appointed for him.

Detective Lucius Moore, Chicago Police Department, also participated in the arrest of the defendant. He testified at the hearing that while at the police station during the early morning hours of December 22, the defendant and Gray conversed alone on two separate occasions. Sometime around 5:00 A.M. or 6:00 A.M. that morning the defendant made a voluntary statement to Moore and Commander Flannagan of the Chicago Police Department, in which he related the events surrounding the homicide and attempted armed robbery of the bank. Moore stated that the defendant was never physically abused or threatened, and no promises were made to him.

Matthew P. Walsh, an assistant State's Attorney, also testified at the hearing. He stated that at approximately 3:35 P.M. on December 22, 1969, he took a statement from the defendant regarding the events at Gateway Bank. The statement was transcribed by a court reporter and later reduced to typewritten form. Mr. Walsh further testified that prior to giving the statement the defendant stated he understood his rights, that he was not threatened or coerced and that the statement was given freely and voluntarily without the benefit of counsel.

The defendant testified in his own behalf at the hearing. He stated that immediately after his arrest on December 22, he told Craig that he was an addict and that another officer offered him some narcotics. He further testified that during his detention on the morning of December 22, Detective Commander Flannagan directed an officer to give him some terpinhydrate and later he was given some heroin. The defendant admitted giving a statement to Mr. Walsh and also admitted that Walsh explained to him his rights but stated that no one prior to that time had done so. He further stated that he did not tell Walsh about the heroin, but admitted telling him that his statement was freely and voluntarily given.

On the basis of this testimony the judge found that there had been probable cause to arrest the defendant and that his constitutional rights were not violated and that, therefore, the statement taken from him would not be suppressed.

A second pretrial hearing was held on April 16, 1970, on the defendant's motion to suppress certain identification testimony during which the following facts were disclosed.

Jacqueline Siller, an employee of the Gateway Bank, testified that she and four or five other bank employees were called by the police on December 22, 1969, and asked to view a lineup at a nearby police station. When the group of bank employees arrived, they were cautioned by the officers conducting the lineup that they were not to say anything to each other, either during or after viewing the lineup and that they were not to make any motions if they recognized anyone in the lineup that had participated in the attempted robbery of the bank.

The group of employees then viewed the first lineup consisting of six men. The bank employees were then taken from the room and returned, one at a time, to view the lineup again, individually. Miss Siller recognized no one in the first lineup. The employees then repeated the same procedure with a second lineup consisting of five men. After viewing the second lineup, first as a member of the group and then by herself, Miss Siller told the officers, out of the presence of the other bank employees, that she recognized the defendant as one of the group of men that attempted to rob the bank on December 12. Miss Siller further stated that she had not seen any of the men in the second lineup in the station earlier that day before the lineup and had never seen any pictures of them before. She also testified that she did not know whether the defendant had worn a fur hat at the time of the robbery. She also identified a picture (People's Exhibit 1) that she recognized as a true and accurate photographic copy of the second lineup.

James Digby, a Gateway Bank employee, also testified at the hearing. He described the procedure that was used during the lineup on December 22 and his description of that procedure was approximately the same as the prior testimony given by Miss Siller.

The defendant testified at the hearing and stated that all members of the lineup were requested to do and say the same things, except that only he was requested to repeat a phrase that was uttered by one of the robbers. He also identified a picture of the lineup as a true and accurate representation of the lineup he was in.

During the hearing it was stipulated by the State that the defendant was not advised that he had a right to have counsel present at the lineup. After argument by counsel, the motion to suppress the identification testimony was denied.

The Grand Jury on February 27, 1970, returned a four-count indictment against the defendant and three codefendants. Count I of the indictment alleged that on December 12, 1969, the defendants Lee Bates,

Eddie L. Franklin, Gerald Brooks and Paul Bullock, committed the offense of murder in that they intentionally and knowingly shot and killed Richard Mix with a gun, without lawful justification. (Ill. Rev. Stat. 1969, ch. 38, par. 9—1.) Count II alleged the offense of murder in that the defendants, Bates, Franklin, Brooks and Bullock, on December 12, 1969, shot and killed Mix with a gun, knowing such shooting created a strong probability of death or great bodily harm to Mix. (Ill. Rev. Stat. 1969, ch. 38, par. 9—1(a-2).) Count III alleged that on December 12, 1970, the defendants, Bates, Franklin, Brooks and Bullock, committed the offense of murder in that they shot and killed Mix with a gun while attempting to commit a forcible felony, to-wit: armed robbery. (Ill. Rev. Stat. 1969, ch. 38, par. 9—1(a-3).) Count IV alleged the defendants commited the offense of attempt. Ill. Rev. Stat. 1969, ch. 38, par 8—4.

After a jury trial the defendant was found guilty of both murder and attempt robbery and sentenced generally on the charges in the indictment to a term of not less than 30 nor more than 40 years in the Illinois State Penitentiary.

Defendant first argues that his conviction for murder cannot stand because he was tried for that crime under a void indictment. He argues that since he was admittedly not the person who actually shot Mix, the only count of the indictment that could possibly sustain his conviction for murder is Count III, and this count is void because it charges that offense was committed subsequent to the return of the indictment. In February, 1970, the Grand Jury returned the indictment charging, in the first two counts, that the murder occurred on December 12, 1969, and charging in Count III that the murder occurred on December 12, "1970."

The State argues that notwithstanding the fact that it failed to amend Count III of the indictment to conform to the proof, that count was rendered valid on the basis of the entire record and, therefore, supports the conviction.

An examination of the record discloses that Count III of the indictment charges, in a different form, the same murder of the same person that was charged in Counts I and II. During the course of the trial at least thirteen of the State's sixteen witnesses testified that the date of the incident was December 12, 1969. Nowhere in the record, either during trial or during the pretrial proceedings, does it appear that the defendant or his counsel were either surprised or confused by the typographical error as to the date in Count III. The date of the offense was clearly established in the defendant's written confession taken shortly after his arrest. Furthermore, in response to the defendant's motion for disclosure, in which he requested "the date of the occurrence if other

than specified in the indictment \* \* \*" the State answered, "The incident alleged in the indictment occurred on December 12, 1969, at the Gateway National Bank, 7853 S. Stony Island Avenue, Chicago, Illinois, between 9:30 A.M. and 9:45 A.M."

■■■ The cases in Illinois are clear in holding that a typographical error as to the date of an offense, even an error charging an offense to have occurred after the return of the indictment, is patent and does not constitute a void indictment as long as, in the context of the entire record, it is clear that the date of the offense was known to the defendant and the error did not mislead him or hinder his defense. (*People v. Curry* (1971), 1 Ill.App.3d 87, 272 N.E.2d 669; *People v. Greenwood* (1969), 115 Ill.App.2d 167, 253 N.E.2d 72; *People v. Hubbard* (1970), 46 Ill.2d 563, 264 N.E.2d 144.) The incorrect date that appeared in Count III of the indictment was a clerical error and did not, in any way, hamper the preparation of a defense or prejudice the defendant and, therefore, does not render the indictment void.

The defendant next contends that he was arrested without probable cause, and the statement he gave to the police was the product of the unlawful arrest. Therefore, he argues that the statement must be suppressed, citing *Wong Sun v. United States* (1963), 371 U.S. 471, and he further argues that the lineup identification and in-court identification is also tainted and must be suppressed, citing *People v. Bean* (1970), 121 Ill.App.2d 332, 257 N.E.2d 562. We do not agree.

■■■ Probable cause for arrest exists when the facts and circumstances within the arresting officer's knowledge, and of which he had reasonable and trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in believing that an offense has been committed, and that the person arrested is guilty. (*People v. Higgins* (1972), 50 Ill.2d 221, 278 N.E.2d 68; *People v. Peak* (1963), 29 Ill.2d 343, 194 N.E.2d 322.) The question of what information is necessary and sufficient to establish probable cause is always dependent upon the facts and circumstances of each individual case. *People v. Theo* (1971), 133 Ill.App.2d 684, 273 N.E.2d 498; *People v. McCrimmon* (1967), 37 Ill.2d 40, 224 N.E.2d 822.

In the instant case the police were provided with at least three eyewitness descriptions of the defendant. Jacqueline Siller described the offender as fairly short, wearing a brown or tan coat, not too dark complected, but a little darker than herself. Thomas Campbell described the offender as being five feet six to seven inches tall, medium build, weighing about 145 pounds, having dark complexion, wearing a three-quarter length coat with a brown collar and a Russian-style Mouton Lamb cap. William Gaines described him as a young man with light brown skin,

wearing a three-quarter length coat and a Russian-type hat with fur.

Detective Craig, who effectuated defendant's arrest, testified that on the day prior to the arrest he received information from a reliable informant that the defendant was one of the four persons involved in the attempted robbery of the bank. Craig testified that he had dealt with this informant about eight times in the past, the result of which was three felony convictions and five misdemeanor convictions. The informant told Craig that he had seen the guns used in the attempted robbery of the bank. He described the guns he saw and told Craig that Buddy Gray had told him that they were used in the attempted robbery. The unnamed informant further told Craig that Gray admitted that the person with whom he shared the apartment, the defendant Bates, was one of the four men that had taken part in the crimes committed at the bank.

■■ The defendant relies on the cases of *Aguilar v. Texas* (1964), 378 U.S. 108, and *Spinelli v. United States* (1969), 393 U.S. 410, to support his argument that the information known to Craig at the time of defendant's arrest did not amount to probable cause. He argues that in receiving information from a reliable informant, Craig satisfied only the first part of the two-part test established by these cases. Both *Aguilar* and *Spinelli* dealt with situations in which law enforcement officials, in reliance upon information supplied by police informants, attempted to secure search warrants. These cases hold that when information supplied by a police informant is used in order to supply probable cause for a search warrant, the magistrate must be informed of both the reason why the informant is credible and reliable, and the underlying circumstances relied upon by the informant. In the instant case we are dealing with the warrantless arrest of the defendant on the street. But, even if we rely upon the two-part test established in these two cases, we find that Craig had the necessary probable cause to justify the defendant's arrest. Craig not only had information supplied by a reliable informant but also was aware of the underlying circumstances which gave rise to the informant's statement that the defendant was involved in the murder and attempted robbery. This information known to Craig, coupled with the description given by eyewitnesses, was sufficient to warrant a man of reasonable caution in believing that the defendant Bates was a participant in the crime.

■■ The defendant next argues that the lineup and in-court identification testimony should be suppressed because he was not informed of his right to counsel at the lineup held on December 22, 1969. The issue of whether a defendant has a right to counsel at a pre-indictment lineup was recently decided by the United States Supreme Court in *Kirby v.*

*Illinois* (1972), 406 U.S. 682. There the court held that since a pre-indictment lineup is not a critical stage of the prosecution there is no absolute constitutional guarantee to representation by counsel.

■■ The defendant next alleges that the lineup in which he was identified on December 22, 1969, was so unfair as to require that the witness identification which resulted be suppressed. The defendant was identified during the second lineup viewed by the bank employees on December 22, 1969. No one viewed in the first lineup of suspects was placed in the second lineup. We have previously discussed the elaborate precautions that the police used in order to insure that the viewers did not influence one another in their identification of any of the suspects. A picture of the lineup, which even the defendant admitted to be a true and accurate reproduction of the actual scene, is included in the record on appeal. The picture shows five men standing next to one another facing the camera. The men are of varying heights, three are slightly taller than the defendant, the other man and the defendant were about the same height. All of the men are dark complected. All have jackets or coats on, and four of the five are wearing hats. The defendant attaches great weight to the fact that he is the only member of the lineup who is wearing a fur cap and argues that this attire is so suggestive that the lineup was reduced to the equivalent of a one-man showup. We cannot agree.

It is true that two of the three witnesses who described the defendant mentioned that he wore a fur cap on the day of the incident at Gateway Bank. But, it is also significant that when viewed in a lineup, wearing a fur cap, the only witness that positively identified him, Jacqueline Siller, was the one who did not mention the fur cap in her original description. When asked later, during the hearing on defendant's motion to suppress identification testimony, whether she remembered if the man she saw on December 12, 1969, wore a fur cap, she replied that she did not know.

After viewing the photographic reproduction of the lineup that occurred on December 22, 1969, reviewing the testimony recounting the procedure used at the lineup and considering the totality of the surrounding circumstances, we find that the confrontation was not unnecessarily suggestive or conducive to irreparable mistaken identification. *People v. Lee* (1969), 44 Ill.2d 161, 254 N.E.2d 469.

■■ Finally, the defendant contends that the pretrial hearing concerning the suppression of identification testimony was so restricted that a new hearing should be held. During the course of the hearing defense counsel attempted to question Jacqueline Siller, a bank employee who had identified the defendant at the lineup, about her opportunity to ob-

serve the offenders on the day of the attempted robbery. The State's objection to this question was sustained and the judge explained his ruling by stating that he limited hearings of this type, in the first instance, to a determination of whether the circumstances surrounding the lineup identification were so suggestive as to deprive the defendant of due process of law. If he determined that the defendant's constitutional rights were violated, he would then conduct another hearing to determine whether the in-court identification was tainted by the unconstitutional identification procedure, and at this time would allow inquiry into the witness's opportunity to observe the offender at the time of the alleged offense. The defendant argues that the ruling of the trial judge is improper and cites *People v. Robinson* (1970), 46 Ill.2d 229, 263 N.E.2d 57, and *People v. Blumenshine* (1969), 42 Ill.2d 508, 250 N.E.2d 152, as authority for his argument.

We find that the defendant's reliance upon these cases is misplaced. In *Robinson* the court reversed the defendant's conviction and directed a new hearing to be held on defendant's motion to suppress identification testimony, but the facts in that case distinguish it from our own. There the Supreme Court recognized that factors other than the trial judge's restrictions on defense counsel's questions during the course of hearing contributed to a denial of a fair hearing. In that case certain personal animosities between the participants affected the tone and quality of the hearing.

The defendant also relies on *People v. Blumenshine* to support his argument that in the instant case he should have been allowed, during the hearing, to question Miss Siller on her opportunity to observe the defendant. The court in *Blumenshine,* only after it had determined that the in-custody identification of the defendant was unconstitutionally suggestive, vacated his conviction and remanded the case to the circuit court in order to hold a hearing to determine whether each witness's identification had an origin independent of the improperly suggestive confrontation at the police station. That opinion continued and listed certain factors that could be taken into consideration by the trial judge at the hearing to determine any independent origin for the witness's identification, one of which was the prior opportunity to observe the alleged criminal act.

The situation presented in *Blumenshine* was not the same situation that confronted the trial judge in the instant case. In this case the trial judge had not made any determination as to whether the lineup of December 22, 1969, was unconstitutionally suggestive at the time defense counsel attempted to question the witness about her opportunity to observe the defendant. The issue under consideration by the court

at the time of defense counsel's question was whether the facts surrounding the lineup of December 22, caused a violation of the defendant's constitutional rights, and, therefore, there was no need to delve into factors that related to the witness's opportunity to observe the defendant at a time and place independent of the confrontation at the police station. (See, *United States v. Wade* (1967), 388 U.S. 218.) If the court determined that the lineup identification was to be suppressed, the hearing would then have turned to the issue of whether there had been an opportunity for the witness to observe the defendant at the time of the criminal act which was sufficiently independent of the lineup to support any further in-court identification. At that time defense counsel would have been entitled to inquire about the witness's opportunity to observe. This is the principle affirmed in *Blumenshine*. In the instant case the court determined that the lineup was not unconstitutionally suggestive, and the witness did not need an independent origin in order to support her in-court identification of the defendant. At the time of the trial defense counsel was not deprived of his right to question the credibility of the witness in her identification of the defendant, as the issue of the witness's opportunity to observe the defendant at the time of the commission of the offense became one for the trier of fact.

■■ At trial Miss Siller, on direct examination, testified that the attempted robbery took place at approximately 9:30 A.M. in the well lighted bank building. She saw the defendant run by her desk and then observed him in front of the bank for ten to fifteen seconds and nothing obstructed her view. At the time she observed him at the front of the bank she was lying on the floor with another person on one of her legs, but she was propped up on her side thus enabling her view of the defendant. She further testified that she again saw him through the window of the building as he was fleeing the bank. On cross-examination she was thoroughly questioned about her opportunity to observe the defendant during the incident, and her testimony was not shaken or contradicted in any material detail. The totality of circumstances surrounding the incident gave her ample opportunity to observe the defendant and thus provided an adequate basis for both the lineup and in-court identification of him.

For these reasons the judgment is affirmed.

Judgment affirmed.

DEMPSEY, P. J., and McNAMARA, J., concur.